1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DONALD RAY JACKSON,

11              Petitioner,                    No. 2: 02-cv-0946 FCD KJN P

12        vs.

13   TOM CAREY,

14              Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In 1985 petitioner was convicted of second degree

19   murder with an enhancement for use of a deadly weapon.  Petitioner is serving a sentence of 16

20   years to life.

21              In the instant action, petitioner challenges the October 2000 decision by the

22   California Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was

23   petitioner's sixth suitability hearing.  This action is proceeding on the amended petition filed by

24   petitioner without counsel on March 30, 2004.  (Dkt. No. 10.)   Petitioner raises the following

25   claims: 1) two of the commissioners on the 2000 BPH panel had a conflict of interest;

26   2) insufficient evidence to support the decision finding petitioner unsuitable; 3) the parole

1   authority does not represent a cross-section of the population; 4) the suitability hearing was

2   untimely.

3           On June 10, 2005, respondent filed an answer.  (Dkt. No. 14.)  On July 6, 2005,

4   petitioner filed a pro se traverse.  (Dkt. No. 16.)  On December 21, 2007, petitioner's counsel

5   filed a supplemental brief.  (Dkt. No. 59.)  After carefully considering the record, the undersigned

6   recommends that the petition be denied.

7   II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

8           In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

9   the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

10  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

11  court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

12  Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly

13  established law applies to two situations:  (1) where the state court legal conclusion is opposite

14  that of the Supreme Court on a point of law; or (2) if the state court case is materially

15  indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

16  opposite.

17          "Unreasonable application" of established law, on the other hand, applies to

18  mixed questions of law and fact, that is the application of law to fact where there are no factually

19  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20  Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

21  to state court decisions.  While the deference is not blindly automatic, "the most important point

22  is that an unreasonable application of federal law is different from an incorrect application of

23  law....[A] federal habeas court may not issue the writ simply because that court concludes in its

24  independent judgment that the relevant state-court decision applied clearly established federal

25  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

26  11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

1  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

2  authority. Woodford v. Viscotti, 537 U.S. 19 (2002).

3            "Clearly established" law is law that has been "squarely addressed" by the United

4  States Supreme Court. Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

5  settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

6  Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

7  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

8  unnecessary showing of uniformed guards does not qualify as clearly established law when

9  spectators' conduct is the alleged cause of bias injection).

10           The state courts need not have cited to federal authority, or even have indicated

11  awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002).

12  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

13  unreasonable application of, established Supreme Court authority. Id.  An unreasonable error is

14  one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v.

15  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

16  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

17  as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v.

18  Packer, 537 U.S. at 9.

19           However, where the state courts have not addressed the constitutional issue in

20  dispute in any reasoned opinion, the federal court will independently review the record in

21  adjudication of that issue.  "Independent review of the record is not de novo review of the

22  constitutional issue, but rather, the only method by which we can determine whether a silent state

23  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

24  2003).

25           When reviewing a state court's summary denial of a claim, the court "looks

26  through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

3

1 | F.3d 1072, 1079 n. 2 (9th Cir. 2000).

2 | III.  Discussion

3 |       A. Insufficient Evidence

4 | In claim two, petitioner alleges that there was insufficient evidence to support the

5 | BPH's 2000 decision finding him unsuitable for parole.  Respondent argues that this claim is

6 | moot because petitioner has had three subsequent parole suitability hearings.  Subsequent parole

7 | denials do not render this claim moot.  First, petitioner is still in custody as a result of the 2000

8 | decision he challenges in this petition.  Second, petitioner's claim challenging the denial of parole

9 | fall within the "capable of repetition yet evading review" exception to mootness.  See Hubbart v.

10 | Knapp, 379 F.3d 773, 777 (9th Cir. 2004) (finding that a habeas petition challenging a two-year

11 | commitment under California's Sexually Violent Predator Act "evaded review" because the

12 | duration of the commitment was too short to be fully litigated prior to its expiration).

13 | Accordingly, respondent's argument that this claim is moot is without merit.

14 | The Due Process Clause of the Fourteenth Amendment to the United States

15 | Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

16 | due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation

17 | must demonstrate that he or she was deprived of a protected liberty or property interest, and then

18 | show that the procedures attendant upon the deprivation were not constitutionally sufficient.

19 | Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan,

20 | 306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due

21 | Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

22 | In the context of parole, the United States Constitution does not, in and of itself, create a

23 | protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van

24 | Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses

25 | mandatory language, it "'creates a presumption that parole release will be granted' when or

26 | unless certain designated findings are made, thereby giving rise to a constitutional liberty

1  interest." <u>McQuillion</u>, 306 F.3d at 901 (quoting <u>Greenholtz v. Inmates of Neb. Penal</u>, 442 U.S.

2  1, 12 (1979)).

3         Under California law, prisoners serving indeterminate prison sentences "may

4  serve up to life in prison, but they become eligible for parole consideration after serving

5  minimum terms of confinement." <u>In re Dannenberg</u>, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417

6  (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board

7  will set a parole release date "in a manner that will provide uniform terms for offenses of similar

8  gravity and magnitude in respect to their threat to the public." <u>In re Lawrence</u>, 44 Cal.4th 1181,

9  1202, 82 Cal.Rptr.3d 169 (citing Cal.Penal Code § 3041(a)).  A release date will not be set,

10  however, if the Board determines "that the gravity of the current convicted offense or offenses, or

11  the timing and gravity of current or past convicted offense or offenses, is such that consideration

12  of the public safety requires a more lengthy period of incarceration...." Cal.Penal Code § 3041(b).

13         California state prisoners who have been sentenced to prison with the possibility

14  of parole have a clearly established, constitutionally protected liberty interest in receipt of a

15  parole release date.  <u>Allen</u>, 482 U.S. at 377-78 (quoting <u>Greenholtz</u>, 442 U.S. at 12); <u>Irons v.</u>

16  <u>Carey</u>, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing <u>Sass v. Cal. Bd. of Prison Terms</u>, 461 F.3d

17  1123, 1128 (9th Cir. 2006)); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003); <u>McQuillion</u>,

18  306 F.3d at 903.

19         In the context of parole proceedings, it is well established that inmates are not

20  guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process

21  Clause.  <u>See</u> <u>Pedro v. Or. Parole Bd.</u>, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  Nonetheless,

22  inmates are afforded limited procedural protections. The Supreme Court has held that a parole

23  board's procedures are constitutionally adequate so long as the inmate is given an opportunity to

24  be heard and a decision informing him of the reasons he did not qualify for parole.  <u>Hayward v.</u>

25  <u>Marshall</u>, 603 F.3d 546, 560 (9th Cir. 2010) (quoting <u>Greenholtz</u>, 442 U.S. at 16).  As a matter of

26  state constitutional law, denial of parole to California inmates must be supported by "some

1  evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re

2  Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44

3  Cal.4th 1181, 1191, 82 Cal.Rptr.3d 169 (2008) (recognizing  the denial of parole must be

4  supported by "some evidence" that an inmate "poses a current risk to public safety"); In re

5  Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same).  "California's 'some

6  evidence' requirement is a component of the liberty interest created by the parole system of [the]

7  state," Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010), and compliance with this

8  evidentiary standard is, therefore, mandated by the federal Due Process Clause.  Pearson v.

9  Muntz, 606 F.3d 606, 611 (9th Cir. 2010).  Thus, a federal court undertaking review of a

10  "California judicial decision approving the ... decision rejecting parole" must determine whether

11  the state court's decision "was an 'unreasonable application' of the California 'some evidence'

12  requirement, or was 'based on an unreasonable determination of the facts in light of the

13  evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

14          When assessing whether a state parole board's suitability decision was supported

15  by "some evidence," the analysis "is framed by the statutes and regulations governing parole

16  suitability determinations in the relevant state."  Irons, 505 F.3d at 851.  The court must

17  look to California law to determine what findings are necessary to deem a petitioner unsuitable

18  for parole, and then must review the record to determine whether the state court decision holding

19  that these findings were supported by "some evidence" or whether it constituted an unreasonable

20  application of the "some evidence" principle.  Id.

21          Title 15, Section 2402 of the California Code of Regulations sets forth various

22  factors to be considered by the Board in its parole suitability findings for murderers.  The

23  regulation is designed to guide the Board's assessment regarding whether the inmate poses an

24  "unreasonable risk of danger to society if released from prison," and thus whether he or she is

25  suitable for parole.  In re Lawrence, 44 Cal.4th at 1202, 82 Cal.Rptr.3d 169.  The Board is

26  directed to consider all relevant, reliable information available, including the circumstances of

the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. 15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal.Code Regs. § 2402(c)-(d). The overriding concern is public safety, In re Dannenberg, 34 Cal.4th 1061, 1086, 23 Cal.Rptr.3d 417 (2005), and the focus is on the inmate's current dangerousness. In re Lawrence, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169. Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety. In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008). Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." In re Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169. In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. Id. at 1227, 82 Cal.Rptr.3d 169.

The BPH found petitioner unsuitable for parole in 2000 for the following reasons. First, the BPH stated that the "number one" reason for finding petitioner unsuitable was the gravity of the offense which it characterized as an "extended brutal and violent attack on the victim..." (Dkt. No. 14-5, p. 47.) The BPH also found that petitioner did not have adequate parole plans. (Id., p. 48.) The BPH further found that petitioner needed additional therapy to deal with the causative factors of the offense. (Id., p. 49.) In order to determine whether these findings were supported by "some evidence," the undersigned will summarize the testimony and

1   evidence from the 200 suitability hearing.[1]

2          At the beginning of the 2000 hearing, the BPH described petitioner's crime:

3          At 11:45 p.m. on October 24, 1984, Elizabeth Wilson, a resident of 2100 East 99th
           Place in the Jordan Downs Housing Project of Los Angeles was awakened by
4          shouting outside of the residence.  She heard Ray Brown, whom she had know[n]
           for five years, repeated[ly] yelling, in quote, I'm not going, unquote.  She got up
5          from her bed, went downstairs and looked outside.  She saw appellant – in this
           case, Mr. Jackson, and Brown, fist fighting but did not see that either man had a
6          weapon.  Wilson went upstairs to get her robe and returned to the front door about
           three minutes later.  She observed Brown laying on the ground.  Jackson was
7          bending over him, cutting his face.  She did not see a knife in Jackson's hand.
           Wilson said, don't do that, don't do that.  Jackson looked at her and moved away
8          from Brown.  He pointed a finger at her and said, move that car, in an apparent
           reference to Brown's car.  Brown lay motionless on the ground.  Wilson returned
9          to her residence to get her door key and then went to Betsy House's home.  She
           asked Mrs. House, the mother of Jackson's girlfriend, to stop the fight.  Mrs.
10         House sent her son Curtis to walk back to the fight scene with Wilson.  Wilson
           testified that Jackson was still cutting and kicking Brown when she and Curtis
11         House reached the scene of the fight.  Curtis asked Jackson, can't you see you're
           killing the man?  Jackson stood up and responded quote, he deserved to die,
12         unquote.  He also said that Curtis would, quote, get the same, unquote, if he did
           not get away from him.  Curtis testified that Jackson was standing over Brown,
13         holding a knife, when he and Wilson arrived at the scene of the fight.  He told
           Jackson, look what you have done, the man is dying.  Jackson responded, if only
14         you knew what he'd done.  He also said, you deserve to die.  You will die too.

15  ─────────────
16         [1] In 2005, petitioner filed a habeas corpus petition in the United States District Court for
    the Central District of California challenging the 2003 decision by the BPH finding him
17  unsuitable for parole.  See Jackson v. Carey, 2:05-cv-3327 NM E.  In that case, petitioner argued
    that the 2003 decision finding him unsuitable based on the circumstances of his commitment
18  offense was not supported by sufficient evidence.  The Central District Court found that the BPH
    properly relied on the circumstances of the offense to find petitioner unsuitable.  Id., Dkt. No. 28,
19  p. 7 of 12.  In 2007, the Ninth Circuit affirmed the Central District:

20         Jackson contends that the California Board of Prison Terms' (the "Board")
           decision to deny him parole violated his due process rights. We disagree because
21         there was "some evidence" to support the Board's denial of parole, including not
           only the gravity of the commitment offense, but also inadequate parole plans and a
22         failure to adequately participate in self-help programs such as Alcoholics
           Anonymous. See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th
           Cir.2006).
23
    Jackson v. Carey, No. 05-56734, 2007 WL 2088279 at * 1 (9th Cir. 2007).
24
           Because the law regarding due process in the parole suitability context has been
25  recently clarified, the undersigned will consider the merits of petitioner's claims rather than adopt
    the reasoning of the Central District and Ninth Circuit.
26

1 (Id., pp. 7-9.)

2   Petitioner told the committee that he did not remember making the statements

3 quoted above, but it was possible that he made them.  (Id., p. 10.)   Petitioner stated that he did

4 not remember making the statements because it had been 16 years and he had been drinking

5 alcohol and smoking marijuana on the night of the killing.  (Id.)  Petitioner went on to tell the

6 committee that on the night of the killing he and Brown, who he had met that day, went to a bar

7 together.  (Id., p. 11.)  Brown told petitioner that he wanted to drive his girlfriend home.  (Id.)

8 Petitioner went with Brown and fell asleep in the car.  (Id.)  Petitioner told the committee that

9 when he woke up, Brown had petitioner's knife and wallet in his hand and was going through

10 petitioner's pockets.  (Id., pp. 11-12.)  The fight then ensued that led to petitioner stabbing

11 Brown.  (Id., p. 11.)   Petitioner was able to get the knife away from Brown.  (Id.)  Petitioner later

12 told the police that he acted in self-defense.  (Id., p. 13.)  Petitioner was found guilty after three

13 trials.  (Id., p. 15.)

14   At the hearing, petitioner was asked by Commissioner Hepburn if he was trying to

15 kill Brown:

16   Commissioner: Were you trying to kill him?

17   Petitioner: I was kind of scared.  You know how it is, when you're full of alcohol
and rambling out the mouth and fighting.  It was a drunk fight.

18

19   Commissioner: Well, I don't really know how it is, but you accept that that's
probably true, that you stabbed him?

20   Petitioner: Oh yes, Sir.

21   Commissioner: I mean, if had those injuries, you believe that you inflicted them?

22   Petitioner: Yes, yes.

23   Commissioner: All right.  Give me one second here, because I'm looking back at
the transcript from '99.

24

25   Petitioner: Keep in mind now, it was a little knife.  A little pocket knife.

26 (Id., pp. 39-40.)

1    At the conclusion of the hearing the deputy district attorney in attendance asked

2 petitioner why, if it was self-defense, did he then continue slashing at the victim's face once the

3 victim had stopped attacking him, and why he continued stabbing the victim in the chest and

4 abdomen.  (Id., p. 42.)  Petitioner answered, "Insanity."  (Id.)  When asked if he thought he was

5 crazy at the time, petitioner answered, "Yes.   I mean, from his aggressions and the fight

6 pursuing, yes."  (Id.)

7    The committee later discussed petitioner's psychological report dated August 16,

8 2000.  A copy of this report is attached as an exhibit to the original petition filed May 2, 2002.

9 (Dkt. No. 1.)  Dr. Taylor, who performed the psychological evaluation assessed petitioner's

10 future dangerousness as follows:

11    In 1991, it was noted that he had programmed favorably with no disciplinary
       write-ups.  He was found to "be relatively well adjusted and stable personality
12     without any manifestations of anger or hostility," and "There was no evidence of a
       potential for violence," in a report of June 1995.  He currently has a classification
13     score of 0 with a "familiarity with staff" disciplinary note in 1995.  He completed
       courses in welding (multiple aspects), and has been active in the past such as in
14     AA and NA, and it was reported that there are a number of laudatory chronos in
       his file.

15
       He appears to minimize, to some degree, the intensity of the assault on the victim,
16     but also voices intentions of better decision making in the future and has been
       active in dealing with substance abuse issues.  He appears to have adjusted and
17     performed well while in prison with little evidence of difficulties controlling any
       feelings of anger, acting impulsively or aggressively, or resisting custody
18     regulations and demands.

19 (Dkt. No. 1, attached exhibits).

20    During the hearing, the committee also noted that petitioner had no criminal

21 record as an adult or juvenile.  (Dkt. No. 14-15, p. 17.)

22    The committee also discussed petitioner's prison record, which was favorable.  In

23 particular, petitioner had participated in Alcohol and Narcotics Anonymous programs.  (Id., p.

24 24.)  Petitioner had also become a certified welder and participated in legal studies.  (Id., pp. 24-

25 25.)  Petitioner had received several laudatory work chronos.  (Id., p. 28.)  Petitioner had received

26 only one prison disciplinary while in prison and that was in 1995.  (Id., p. 31.)  Petitioner also

1  had three "very dated" counseling chronos.  (Id.)

2        The committee told petitioner that its report indicated that he had no clear parole

3  plans.  (Id., p. 32.)  Petitioner told the committee that he had been working on his parole plans

4  since 1998.  (Id.)  Petitioner gave the committee a copy of his form requesting that his county of

5  parole be transferred to a different county.  (Id., pp. 32-33.)   Petitioner told the committee that he

6  had not yet received a response to the request.  (Id., p. 33.)   This request was dated August 7,

7  2000.  (Id., p. 34.)  The committee also noted that petitioner had no letters of support from family

8  members in Richmond, where he wanted his parole transferred.  (Id., p. 35.)  Petitioner told the

9  committee that his family had written letters in support of his 1998 suitability hearing.  (Id., p.

10  36.)  The committee told petitioner that each time he had a hearing, he had to have new letters of

11  support.  (Id.)

12        The undersigned first considers whether "some evidence" supported the BPH's

13  finding that petitioner required additional therapy to deal with the "causative factors" of the case.

14  (Dkt. No. 14-5, p. 49.)  In making this finding, the committee went on to state that,

15        Mr. Jackson, I think the Panel believes that you're still having difficulty coming to
     terms with the facts of the case, at least as they are known and as they are written
16     in the appellate decision.  And certainly what the – what the jury concluded
     occurred in this case, because they did find you guilty of murder, and that is
17     inconsistent with your version of what occurred.  And hopefully, you'll be able to
     develop additional insight into the factors that caused this incident.

18

19  (Id.)

20        In essence, the BPH found petitioner unsuitable because he minimized the

21  circumstances of the offense.  The 2000 psychological report made this finding which was also

22  reflected in petitioner's testimony at the hearing.  While petitioner admitted stabbing Brown, he

23  told the BPH that he only used a "little pocket knife."  Petitioner's statement that the fight was

24  caused by his drinking and that it was a "drunk fight" also minimized his involvement.

25        The BPH cannot require petitioner to admit guilt in order to be found suitable for

26  parole.  Cal.Penal Code § 5011(b); 15 Cal Code Regs. § 2236.  However, the BPH must consider

1  his "past and present attitude toward the crime" and any lack of remorse or understanding of the

2  nature and magnitude of the offense (15 Cal. Code Regs. tit. 15, §§ 2402(b), 2402(d)(3).

3   Cal.Code Regs. § 2402(d)(3)).  See In re McClendon, 113 Cal.App.4th 315, 322, 6 Cal.Rptr.3d

4  278 (2003); see also In re Shaputis, 44 Cal.4th 1241, 1261 n. 20, 82 Cal.Rptr.3d 213 (2008)

5  ("petitioner's failure to take full responsibility for past violence, and his lack of insight into his

6  behavior, establish that the circumstances of petitioner's crime and violent background continue

7  to be probative to the issue of his current dangerousness.")  "Lack of insight" is probative of

8  unsuitability only to the extent that it is both (1) demonstrably shown by the record and

9  (2) rationally indicative of the inmate's current dangerousness.  In re Calderon, 184 Cal.App.4th

10  670 690, 109 Cal.Rptr.3d 229 (2010).

11         Petitioner's comments to the BPH at the hearing, as well as the psychological

12  report, demonstrated a lack of understanding of the magnitude of the offense.   In addition,

13  petitioner's lack of insight, as demonstrated by his minimizing his involvement, is rationally

14  indicative of his current dangerousness.  Petitioner's lack of insight is directly related to his

15  conduct during the offense.  Accordingly, the finding that petitioner required additional therapy

16  to address this lack of insight was supported by some evidence.

17         The BPH also relied on the circumstances of the 16 year-old-offense to find

18  petitioner unsuitable.  In its decision, the BPH stated,

19         And the number one reason was the gravity of the commitment offense, which the
        Panel finds was an extended brutal and violent attack on the victim in this
20        particular case.  And these conclusions are drawn from the Statement of Facts,
        wherein the prisoner had a knife and according to him, he was intoxicated at the
21        time, and he attacked the victim, according to the Statement of Facts.  And he
        repeatedly slashed and stabbed the victim, resulting in extensive injuries,
22        including four deep stab wounds to the victim's upper torso, resulting in the
        victim's death.  And this occurred over an extended period of time because
23        witnesses yelled at him to stop, and he continued doing what he was doing and
        witnesses approached him while all this was going on.  And they did testify that it
24        was continued over a period of time.

25  (Dkt. No. 14-15, pp. 47-48.)

26         The reliance on the circumstances of the offense was not improper because

petitioner's continued lack of insight regarding his participation in the offense indicated that the

violent nature of the offense was still probative of the risk he posed to public safety.

Finally, the BPH found petitioner unsuitable because he did not have adequate

plans for release.  See Cal. Code Regs. tit. 15, § 2402(d)(8) (realistic plans for release tends to

show suitability).  In particular, the BPH found that petitioner had not properly completed the

parole transfer process and did not have updated letters of support from his family.  This finding

was supported by some evidence.

For the reasons discussed above, some evidence supported the 2000 decision by

the BPH finding petitioner unsuitable parole.  After conducting an AEDPA review, the

undersigned recommends that this claim be denied.

In support of claim two, petitioner also argues that he was not provided with one-

third time credits to reduce his sentence.  Petitioner makes no other argument in support of this

claim.  In any event, for the following reasons, petitioner is not entitled to earn credits at this time

for the reasons stated herein:

> To fully appreciate the limitations of Petitioner's credit-earning capacity as a life prisoner as it relates to the term of his incarceration, it is necessary to examine how California's parole system for life prisoners interacts with a life prisoner's credit-earning potential. A life prisoner's "Minimum Eligible Parole Date," or "MEPD," is the "earliest date on which an Indeterminate Sentence Law or life prisoner may be legally released on parole." See Cal.Code Regs., titl. 15, § 3000; see also Cal.Code Regs., tit. 15, § 2000(b)(67). The CDCR determines the MEPD. See Cal.Code Regs., tit. 15, § 2400. Conversely, "[t]he length of time a prisoner must serve prior to actual release on parole is determined by the [BPH]." Id.

> California law provides that, one year prior to a prisoner's MEPD, a BPH panel shall meet with the prisoner and shall set a release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.Penal Code § 3041(a). Thus, the prisoner's MEPD is the basis for the timing of the initial suitability hearing.

> Following a parole denial, the BPH "shall hear each case annually thereafter," except that the BPH may schedule a subsequent hearing up to five years "after any hearing at which parole is denied" if the prisoner has been convicted of murder and the BPH finds "that it is not reasonable to expect that parole would be granted

at a hearing during the following years and states the bases for the finding in writing." Cal.Penal Code § 3041.5(b)(2).

Following a finding of parole suitability for an inmate convicted of a murder committed on or after November 8, 1978, the BPH sets a base term "established solely on the gravity of the base crime, taking into account all of the circumstances of that crime." Cal.Code Regs., tit. 15, § 2403(a). The BPH sets a base term by taking into account the "matrix" of suggested base terms, circumstances in aggravation and mitigation, and adjustments for enhancements or other offenses. See Cal.Code Regs., tit. 15, § 2403-2411. However, the BPH may impose a base term other than one provided in the matrix "if justified by the particular facts of the individual case...." Id. Once a base term is set, the BPH may consider awarding post-conviction credit to reduce the base term, up to four months for each year served, depending on the prisoner's performance, participation, and behavior while in prison. See Cal.Code Regs., tit. 15, § 2400-2410.

California Penal Code § 190(a) mandates the application of good behavior credits by the CDCR against the minimum term for first degree murder, i.e., twenty-five years, that is imposed by statute for purposes of establishing the MEPD. In re Dayan, 231 Cal.App.3d 184, 188, 282 Cal.Rptr. 269 (1991). However, nothing in the statute requires the BPH, or CDCR, to reapply those same credits to the actual term it eventually sets for Petitioner's sentence if, and when, it determines that Petitioner is eligible for parole. Id.; see also Cal.Code Regs., tit. 15, § 2400 ("The [Department of Correction and Rehabilitation's] decisions pursuant to Penal Code §§ 2930 et seq. do not affect the [BPH's] decision concerning post-conviction credit pursuant to these rules."). Thus, in theory, if a prisoner were determined to be parole eligible at the earliest possible time, credits might be of some use in actually reducing the amount of time a prisoner served before his initial parole suitability hearing was set. See People v. Rowland, 134 Cal.App.3d 1, 13-14, 184 Cal.Rptr. 346 (1982). However, the question of Petitioner's actual release on parole will be determined only by the BPH, and no matter how much time Petitioner has served, he will not be released until he has been found suitable for parole. Cal. Pen.Code § 3041(b); Cal.Code Regs., tit. 15, § 2281(a).

Burton v. Adams, No. 1: 09-cv-0354 JLT HC, 2010 WL 703182 at *5-6 (E. D. Cal. 2010).

Petitioner is not entitled to earn time credits at this time because he has already passed his MEPD date. Once petitioner is found suitable for parole, the credits may reduce the amount of time he must serve. Because petitioner has not been found suitable for parole, a claim by petitioner that he is entitled to these credits is not ripe.

Petitioner's claim that he is entitled to earn time credits is without merit. After conducting an AEDPA review, the undersigned recommends that this claim be denied.

////

1        B  Conflict of Interest

2            In claim one, petitioner alleges that two of the BPH members who attended the

3    2000 hearing, Commissioners Hepburn and Ortega, had a conflict of interest because they had

4    previously denied his appeal of the 1999 BPH decision finding him unsuitable.  Respondent

5    argues that this claim is moot because petitioner has had three subsequent parole hearings.  The

6    instant claim is not moot for the same reasons that petitioner's claim challenging the sufficiency

7    of the evidence is not moot.

8            In essence, petitioner is arguing that Commissioners Hepburn and Ortega were

9    biased against him based on their participation in his appeal of the 1999 decision.  Although

10   petitioner has a due process right to parole consideration by a neutral, impartial decision-maker,

11   his claim of bias must be supported by the record.  See O'Bremski v. Maas, 915 F.2d 418, 422

12   (9th Cir. 1990) (an inmate is "entitled to have his release date considered by a Board that [is] free

13   from bias or prejudice"); Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) ( "[c]onclusory

14   allegations which are not supported by a statement of specific facts do not warrant habeas

15   relief.").

16           That Commissioners Hepburn and Ortega participated in petitioner's appeal of an

17   earlier BPH decision did not automatically render them biased at the 2000 hearing.  Nothing in

18   the record demonstrates that Commissioners Hepburn and Ortega were biased at the 2000

19   hearing.  See Bettencourt v. Knowles, 2009 WL 4755403, *17-18 (E.D.Cal. 2009) (unpublished)

20   (holding where petitioner has offered no evidence to support claim of parole bias his claim

21   should be denied).  The BPH's decision in this case was thorough and factually specific.

22           After conducting an AEDPA review, the undersigned recommends that this claim

23   be denied.

24           C.  Cross Section/No Parole Policy

25           In claim three, petitioner alleges that he was denied parole pursuant to former

26   Governor Davis' "no parole" policy.  He also alleges that the members of the BPH do not reflect

a cross-section of the population.  Petitioner argues that the BPH is made up of former police officers.

Regarding petitioner's claim that he was found unsuitable pursuant to former Governor Davis' "no parole policy," the record indicates that petitioner has had at least one parole suitability hearing since Governor Davis left office.  Petitioner does not claim that the BPH has operated under a no-parole policy for life prisoners since Governor Davis left office.  Therefore, petitioner has already received all the relief he would be entitled with respect to this claim: a new parole hearing before a BPH panel that does not apply the no-parole policy allegedly followed while Governor Davis was in office.  Accordingly, petitioner is not entitled to relief as to this claim.

Petitioner also alleges that the members of the BPH do not reflect a cross-section of the general population.  In essence, petitioner is alleging that the BPH is made up of biased members.  Respondent argues that this claim is moot because petitioner has had three subsequent parole hearings.  The instant claim is not moot for the same reasons that petitioner's claim challenging the sufficiency of the evidence is not moot.

As stated above, petitioner has a constitutional right to decision makers who are unbiased.  See O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir.1990).  However, in support of the instant claim petitioner does not allege that any of the BPH members at the 2000 hearing were biased against him.  The fact that the "cross-section of community" which petitioner desires has not evidently been the source of selection for parole commissioners does not implicate a federal constitutional claim for biased decision makers.

After conducting an AEDPA review, the undersigned recommends that this claim be denied.

D.  Untimely Hearing

Petitioner argues that the 2000 hearing was untimely.  In particular, petitioner argues that the 2000 hearing was held six months later than it was supposed to have been held.

16

1    Respondent argues that this claim is moot because petitioner has had three

2    subsequent parole hearings.  The remedy for the BPH's failure to hold a timely parole hearing is

3    for the court to order a parole hearing.  Because petitioner has received at least three parole

4    hearings since the 2000 hearing, the instant claim is moot.

5    Moreover, to demonstrate that the six month delay in his receipt of his parole

6    hearing violated due process, petitioner must demonstrate that the delay was unreasonable and

7    prejudicial.  Hopper v. United States Parole Comm'n., 702 F.2d 842, 847 (9th Cir. 1983).

8    "However, due process 'does not include receiving a parole hearing in exact accordance with the

9    specific time period required by [state regulations.]" Johnson v. Paparozzi, 219 F.Supp.2d 635,

10   652 (D.N.J. 2002).  The denial of a timely parole proceeding is not a per se violation due process.

11   Jefferson v. Hart, 84 F.3d 1314, 1316-17 (10th Cir. 1996).  To show a due process violation from

12   a delayed hearing, a prisoner must show prejudice from the delay.  Cf. Camacho v. White, 918

13   F.2d 74, 78-80 (9th Cir. 1990).  Petitioner has failed to demonstrate that the six month delay in

14   his receipt of the 2000 suitability hearing was prejudicial.

15   After conducting an AEDPA review, the undersigned recommends that this claim

16   be denied.

17   Conclusion

18   The undersigned recommends that petitioner's application for a writ of habeas

19   corpus be denied.  If petitioner files objections, he shall also address whether a certificate of

20   appealability should issue and, if so, why and as to which issues.  A certificate of appealability

21   may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the

22   denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

23   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

24   writ of habeas corpus be denied.

25   These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   July 12, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

jackson.hab